*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-CM-1016

JAKYRA PERRY, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2024-CMD-004895)

(John M. Campbell, *Judge*)
(Michael K. O'Keefe, *Judge*)

(Submitted January 22, 2026                    Decided July 2, 2026)

*Jalil D. Dozier* was on the briefs for appellant.

*Jeanine Ferris Pirro*, United States Attorney, with whom *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *Steven B. Snyder*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, DEAHL, *Associate Judge*, and GLICKMAN, *Senior Judge*.

DEAHL, *Associate Judge*: Jakyra Perry was charged with two counts of simple assault based on her alleged participation in a group attack on the complainants, Amari Walton and Akhayla Reynolds. At Perry's trial, the government introduced a

video that showed a group of people beating up the two women, and it contended that Perry was a visible member of the group and the principal instigator of the attack. Walton testified, and after watching the video—which had been posted to Instagram—she made an in-court identification of Perry as the person who initiated the attack against her and Reynolds. Perry was convicted of both assaults and, in addition to her jail sentence, she was directed to pay Walton over $6,000 in restitution to cover Walton's unpaid medical bills and lost wages stemming from the attack.

On appeal, Perry challenges the admission of the Instagram video, Walton's in-court identification of her, and the court's restitution order. We uphold the trial court's rulings and affirm Perry's convictions.

## I. Background

According to the government's evidence at trial, Walton and Reynolds were waiting for an Uber near the U Street Metro station late one night when they saw a group of people in the area "fighting a girl." They called out to the group to stop fighting. A woman with blonde braids and grey leggings turned around and asked, "you all want to bump for them?" Walton and Reynolds did not respond, but the woman approached them and the rest of the group followed her. A man in the group said something and, as Reynolds was responding, the woman with blonde braids

said, "don't talk to my baby daddy." The woman then punched Reynolds in the face, "kind of [from] behind." An unidentified attacker then hit Walton from behind and knocked her out. As Walton regained consciousness, she could see people hitting her and she started punching back. After a few minutes, the fight "died down." Walton and Reynolds then went to the hospital.

Walton spoke with police officers after the fight and described the woman with blonde braids as one of her attackers. The next day, both Reynolds and Walton were sent a video on Instagram that depicted the melee. Eight months later, Perry was arrested and charged with two counts of simple assault against Walton and Reynolds. Details of the police investigation that led to Perry's arrest were not introduced at trial, but she appears to have been identified through some Instagram sleuthing. Law enforcement did not conduct any pre-arrest or pre-trial identification procedures, such as a line up or photo array, to see if Walton or Reynolds could positively identify Perry as one of their attackers.

After her arrest, Perry filed two pre-trial motions relevant to this appeal. First, she moved to exclude the Instagram video, which she argued could not be authenticated without a custodian of records for Instagram. Second, she moved to preclude any in-court identification of her that was based on the Instagram video as unreliable, arguing that allowing a witness to testify that "the person in front of them

is the same person in the video" was usurping the factfinder's role. She argued that the factfinder—the judge, in what was a bench trial—was in just as good a position as Walton to say whether Perry was the woman depicted in the Instagram video, as it appeared that Walton had no independent memory of what Perry looked like except from what the video depicted. Therefore, in Perry's view, the court could "view the video footage and photographs and make its own determination" about whether Perry was the attacker. The court denied both motions, explaining that the video would need to be authenticated at trial and that an in-court identification would be permissible if a witness "can testify in court that they know the person and what the basis is for any knowledge."

The main issue at trial, which took place a year after the attack, was whether Perry was the woman with blonde braids who instigated and participated in the fight with Walton and Reynolds. After Walton described the events of that night, the government introduced the Instagram video. Walton testified that she recognized herself in the video, that she was present while the events in the video took place, and that the video depicted the events as she remembered them. Perry renewed her objection that the video needed to be authenticated by an Instagram custodian of records. The judge overruled the objection, reasoning that Walton had adequately authenticated the video by testifying based on her firsthand knowledge that it accurately depicted the events of that night. Walton explained what transpired in the

video as it was played in court and said she did not know anyone in the melee besides Reynolds. The government then asked her if she saw anyone from the fight in the courtroom. Walton identified Perry as one of her attackers and said that she remembered Perry's face.

Reynolds and the arresting officer also testified, but neither said anything of much relevance to the central issue in the case—whether Perry was one of the people who assaulted Walton and Reynolds. Reynolds could not recall many of the details of the fight. She said she was hit from behind, did not see who hit her, and fell to the ground where she was kicked, punched, and dragged. As for the arresting officer, he testified that he executed an arrest warrant when taking Perry into custody, but that he otherwise had no involvement with the investigation of the case.

After closing arguments, the court opined that the video clearly depicted assaults, so the "only issue" was whether the government had proven beyond a reasonable doubt that Perry was one of the assailants. Relying on Walton's testimony and in-court identification of Perry, the court found that Perry was the blonde woman in the video who had committed assaults on both Walton and Reynolds and found Perry guilty on both counts.

As part of her sentence, the court ordered Perry to pay $6,119.98 in restitution, which the government proffered constituted Walton's outstanding medical bills and

ten days of missed wages due to the assault. Defense counsel argued that this was "a lot of money" and that the government had not presented any hospital bills or pay stubs. The court stated that "whenever somebody is injured, if there are unpaid bills, [they] should be paid for by the perpetrator." The court directed the government to share the hospital bills and pay stubs with Perry and told defense counsel that she could raise any issues she had with the calculations thereafter. Defense counsel did not raise any further objections to the government's calculations after reviewing the government's supporting documents.

Perry now appeals her convictions and the restitution order.

## II. Analysis

Perry raises three arguments on appeal. First, she argues that the Instagram video should not have been admitted into evidence. Second, she argues that Walton's in-court identification should not have been permitted because it was suggestive and unreliable. Third, she argues that, even if we affirm her convictions, the restitution order was unsupported and should be vacated. We address each argument in turn.

### A. The trial court did not err in admitting the Instagram video.

Perry argues that the trial court erred when it allowed the government to admit the Instagram video because (1) it was not properly authenticated, (2) its admission

violated the best evidence rule, (3) it included multiple levels of hearsay, and (4) its admission violated the Confrontation Clause. Perry raised only the first challenge in the trial court, and we review that preserved claim of evidentiary error under the abuse of discretion standard.[1] *Becton v. United States*, 348 A.3d 23, 34 (D.C. 2025). We review the remaining unpreserved challenges for plain error. *See (Tyrell) Johnson v. United States*, 232 A.3d 156, 161-62 (D.C. 2020).

Perry principally argues that the government "failed to present admissible evidence to lay the foundation to authenticate the [Instagram] video at trial" and that the video was therefore "legally irrelevant." "Authenticity—whether an item of evidence is genuinely what its proponent claims it is—is a component of relevance." *Ransom v. United* States, 322 A.3d 521, 527 (D.C. 2024) (quoting *(Carlos) Johnson v. United States*, 290 A.3d 500, 509 (D.C. 2023)). All that a proponent of evidence must show to authenticate it is a "reasonable possibility that the evidence is what it purports to be." *Id.* at 527-28 (quoting *Johnson*, 290 A.3d at 509). One way to

---

[1] Contrary to Perry's assertion that she preserved her "best evidence rule" objection by objecting to the authentication of the video evidence, a challenge to the authentication of evidence does not fairly include a best evidence rule objection. *See Comford v. United States*, 947 A.2d 1181, 1186 (D.C. 2008) ("[O]bjections must be made with reasonable specificity; the [trial] judge must be fairly apprised as to the question on which he is being asked to rule." (quoting *Hunter v. United States*, 606 A.2d 139, 144 (D.C. 1992))).

authenticate video evidence is for a witness "who was present during the events portrayed" to testify that "the video accurately portrays those events." *Id.* at 528.

Walton's testimony that she was in the video, present for the melee depicted in it, and that it accurately portrayed that fight, was sufficient to authenticate the Instagram video. Perry argues that Walton lacked knowledge about whether the recording was accurate because she was hit from behind during the relevant events. However, Walton testified that she saw the woman with blonde braids hit Reynolds and, although she briefly lost consciousness, she later regained consciousness and was able to see people hitting her. The trial court credited this testimony, we have no basis to second guess it, and a witness need not have personal knowledge about every frame of a video to authenticate it. Because Walton authenticated the video through her testimony, it does not matter, contrary to Perry's assertions, that Walton did not create the video or that the video was blurry and apparently edited. *See Johnson*, 290 A.3d at 513 (noting that appellant's unsubstantiated objection that a video introduced at trial had been doctored "did not undermine the trial judge's determination that the videos were sufficiently authenticated").

We next review Perry's unpreserved challenges for plain error.[2] She first argues that admitting the Instagram video violated the best evidence rule, which provides that "an original writing, recording, or photograph is [generally] required in order to prove its content." *Callaham v. United States*, 268 A.3d 833, 847 (D.C. 2022) (citing Fed. R. Evid. 1002). Nonetheless, "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." *Id.* (quoting Fed. R. Evid. 1003). That is, unless Perry provides some basis to think that the Instagram video was an "inaccurate reproduction[]" or an "insufficient duplicate[]" of the original, the best evidence rule affords her no relief. *See id.* (holding that a compilation of surveillance recordings did not violate the best evidence rule because the defendant did not allege it was inaccurate or insufficient). Here, although the video appears to have been edited, these alterations do not make the video "inaccurate" or "insufficient" under *Callaham.* Perry does not suggest that the video unfairly depicted the melee or omitted anything that might have been helpful or material to her defense, and we thus see no error in the video's admission.

---

[2] Under plain error review, we will reverse the trial court's ruling if the appellant shows "(1) there is error, (2) such error is 'plain,' meaning 'clear' or 'obvious,' by the time of appellate review; (3) the error affected appellant's 'substantial rights'; and (4) the error seriously affected 'the fairness, integrity or public reputation of the judicial proceedings.'" *Chew v. United States*, 314 A.3d 80, 83 n.1 (D.C. 2024) (quoting *In re Taylor*, 73 A.3d 85, 96 (D.C. 2013)).

Furthermore, Perry has made no showing that the original was actually available to the government, which is generally a prerequisite to the best evidence rule's application. Fed. R. Evid. 1004.

Perry next argues that the Instagram video was inadmissible hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted." *Holmon v. District of Columbia*, 202 A.3d 512, 517 n.5 (D.C. 2019) (quoting *Little v. United States*, 613 A.2d 880, 882 (D.C. 1992)). And a "statement" includes "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." *Id.* at 517 n.5 (quoting Fed. R. Evid. 801(a)). The images in the video footage are not themselves hearsay because they assert nothing, as is typically the case with bare images. *See Holmes v. United States*, 92 A.3d 328, 331 (D.C. 2014) (holding that a surveillance system does not assert anything). That said, a video can certainly contain statements that are hearsay. *See, e.g.*, *McRoy v. United States*, 106 A.3d 1051, 1058-59 (D.C. 2015) (recognizing that recording of a victim's statements during an interview contained hearsay). But the Instagram video in this case had no audio, so that nothing was asserted within it and none of its contents are properly categorized as hearsay.

Finally, Perry argues that her rights under the Confrontation Clause were violated when the court admitted the Instagram video and the testimony from Walton and Reynolds about the video, and the testimony from the officer who executed the arrest warrant. She argues that the government was required to present testimony from other witnesses, including the author of the Instagram post, the person who took the original video, the people who sent the video to Walton and Reynolds, and the officer who completed the arrest warrant affidavit.

The Confrontation Clause of the Sixth Amendment guarantees the right of defendants in criminal proceedings to "be confronted with the witnesses against" them. U.S. Const. amend. VI. This is not a right to confront every person involved in the government's investigation of this case, or to question any person who handled the pertinent evidence, as Perry seems to argue. Rather, it bars "admission of testimonial statements of a witness who did not appear at trial unless he was unable to testify, and the defendant . . . had a prior opportunity for cross-examination." *Carrington v. District of Columbia*, 77 A.3d 999, 1003 (D.C. 2013) (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). As we have explained, the Instagram video did not include any statements, so its admission did not implicate the Confrontation Clause. As for Walton and Reynolds, Perry had a full and fair opportunity to cross-examine each of them, so the Confrontation Clause's command was satisfied as to them. The government did not introduce any statements from the

individuals who merely shot the video, or from those who relayed it to Walton and Reynolds, so the Confrontation Clause did not require the government to produce them as in-court witnesses. Similarly, the government did not introduce any statements from the officer who completed the arrest warrant affidavit, so the officer did not have to be produced for cross-examination either.

In sum, the Instagram video was properly admitted into evidence, and none of Perry's attacks on that ruling has merit.

*B. The trial court did not err in permitting Walton to identify Perry in court.*

Perry raises two challenges to Walton's in-court identification: (1) that her identification from video footage effectively usurped the role of the factfinder, who was just as capable of comparing Perry to the video footage; and (2) that the identification was suggestive and unreliable.

On the first point, a witness can generally testify to a matter if it is relevant and there is sufficient evidence that they have personal knowledge about it. *Callaham*, 268 A.3d at 848 & n.19 (citing Fed. R. Evid. 602). That testimony must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not

based on scientific, technical, or other specialized knowledge." *Id*. at 848 n.20 (quoting Fed. R. Evid. 701).

As we have explained, the government introduced sufficient evidence that Walton had personal knowledge of the events in the video. She had previously identified the woman with blonde braids as her attacker to police officers and again pointed her out in the video. Although Walton was hit on the head, she saw the group of attackers initially, and again when she regained consciousness.

Contrary to Perry's argument, *Callaham* does not compel a different result. In that case, two detectives narrated the events of a video from which they had identified a suspect at trial even though neither had personally witnessed the events depicted. *Callaham*, 268 A.3d at 836. We said that the detectives could not establish "personal knowledge" just by viewing the footage. *Id.* at 848. But here, unlike in *Callaham*, Walton was there for the events in the video—her personal knowledge stemmed from her presence in the melee, not her review of the video itself.

Perry next argues that Walton's in-court identification of Perry was unduly suggestive and unreliable because Perry was seated at the counsel table and "it was obvious that she was being prosecuted for the alleged crimes." This is a new argument on appeal, which we review for plain error. *See supra* at note 2. Although Perry argued before the trial court that Walton's testimony was inadmissible lay

opinion testimony, she said nothing in her pre-trial motions or at trial about the identification being suggestive, so this argument is unpreserved.

While in-court identification procedures may often be suggestive, we have generally permitted them so long as they bear sufficient hallmarks of reliability. *Green v. United States*, 580 A.2d 1325, 1327 (D.C. 1990). The trial court did not plainly err in determining that this in-court identification was sufficiently reliable to allow. Reliability is evaluated under the totality of the circumstances, considering "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *see also Morales v. United States*, 248 A.3d 161, 176-81 (D.C. 2021) (applying the *Biggers* inquiry to a pre-trial identification). There were several reasons for the judge to think Walton's testimony was reliable, including her previous identification of the woman with blonde braids as her attacker to police, her identification of that woman in the video footage, and her testimony that she remembered Perry's face, hairstyle, and what she was wearing during the fight. While we think a colorable argument could be made that this in-court identification was too unreliable to permit, that is not plainly the case, so there was no reversible error under the plain error standard of review.

*C. The restitution order was not plainly erroneous.*

Perry's last argument is that the restitution order was erroneous for two reasons. First, she argues that the court imposed restitution under a "uniform policy" that the assailant should always pay outstanding medical bills, which she alleges was a way of punishing her more harshly for not naming her accomplices. Second, she argues that the restitution order was not supported by "adequate documentation" to support the amount that she was ordered to pay. We consider those arguments in turn.

The first argument is unpreserved, and we accordingly review it for plain error. *See Briscoe v. United States*, 181 A.3d 651, 655 (D.C. 2018) (reviewing unpreserved objections to sentencing decisions for plain error). A trial court has "broad discretion in imposing a restitution order" provided there is a "factual basis" in the record for the order. *In re N.G.*, 9 A.3d 478, 482 (D.C. 2010) (citation omitted). The court should consider several factors in determining whether to impose restitution, including "the number of victims, the actual damage of each victim, [and] the resources of the defendant." D.C. Code § 16-711(b). The court weighed each of those factors in this case. While the court further opined that assailants should always pay the outstanding medical bills of their victims, that statement does not offend our cases instructing that courts should not sentence defendants according to a "uniform

policy." *See Lindsay v. United States*, 84 A.3d 50, 53 (D.C. 2014). Our cases mean only that, when fashioning the particular sentence, courts should be mindful of the particulars of each case, and the court was faithful to that principle here when it fashioned a restitution order driven by the particular monetary losses that Walton suffered as a result of her assault. *See id.* (requiring that "the defendant's sentence reflect[] an individuated judgment as to the balance of deterrence and rehabilitation applicable in [his] case rather than a categorical approach" (quoting *Thorne v. United States*, 46 A.3d 1085, 1089 (D.C. 2012))). The court's statement that offenders should pay the medical bills of their victims is simply not the type of "uniform policy" that our cases have rebuked—it is on par with saying that all violent felons should serve some time incarcerated to repay their debt to society, which as a baseline rule is perfectly appropriate.

Perry's second argument about the adequacy of the support for the restitution award was likewise not preserved for our review. After defense counsel raised some concern about the lack of documentation for the restitution award in the trial court, the court directed the government to share its documentation with defense counsel and for the parties to inform the court if they were not on the same page about the amount of Walton's lost wages and outstanding hospital bills. After defense counsel had an opportunity to review the government's documentation, defense counsel did not dispute $6,119.98 as the proper amount of restitution. Under the circumstances,

if defense counsel was dissatisfied with the documentation, she was required to renew that challenge after her opportunity to review the supporting documents. Because she did not do that, and on the record before us we cannot say that the restitution award was plainly erroneous,[3] we reject this claim.

### III. Conclusion

For the foregoing reasons we uphold the trial court's rulings and affirm Perry's convictions.

*So ordered.*

---

[3] The government has an outstanding motion to supplement the appellate record with the documents substantiating the $6,119.98 restitution award. Because those documents were not a part of the trial record, and we have rejected Perry's challenge to the restitution order in any event, we deny that motion.